Court. I am Brian Eiler. I'm here on behalf of Billy Saunders, who's here in the courtroom. She is the widow of Trooper Saunders, the plaintiff individually, and also the plaintiff on behalf of Trooper Saunders' estate. As you know, we are here asking that the Court reverse a summary judgment that was granted in favor of the United States. And we're also asking that the summary judgment, at least on the issue of duty and breach of duty. We think that a jury should decide whether the INS's failure to fulfill its mandatory obligation under the statutes to detain this aggravated felon, criminal alien. Well, you don't get a jury trial in the tort claims case, do you? After trial, then. I'm sorry. But anyway, we should certainly there's a question of fact as to whether the government's failure to fulfill its mandatory duty caused the death of Trooper Saunders. Vasquez, under the statutes as enacted, should have either been in jail awaiting state trial for allegedly dealing drugs, or should have been in Mexico. May I ask you a question? Yes. On the duty issue. Yes. You contend that under 1226C, I believe it is, that there's a mandatory duty to take aliens who are released from state custody. Correct. Presumably when they qualify under the statute, following one of those categories, into custody. That's correct. Okay. Now, just following the sequence of events here, when Vasquez was arrested, I believe it was on July 26th, if I'm not mistaken. I think that's correct. July 27th, the jail faxes over to the INS stations, their booking sheet, I guess it was. That's correct. Okay. Where in this statutory scheme or regulation is there any mandatory duty that the INS officials place an automatic hold on Vasquez at that stage? Well, Your Honor. He hasn't been released. He's still in custody. Well, Your Honor, that's the process. But where in the statute does it say that they must place the hold? Because as I understand your argument, as you just said right now, as if a hold had been placed on him when he was released on bail, when Vasquez was released on bail, the local jail facility, with the hold in place and bail, they would not have released him. But you just said. Well, I guess it's not. I want to know where in this statute it requires the INS officials. I guess it's not. As soon as they got this fax to place a hold on him. Vasquez could have made bail the next day on the 27th. I guess my answer would be it's not explicitly stated in the statute. What the statute does. The statute says it has to be taken when released. Now, the government has their own argument about how that statute should be interpreted. But I'm wondering where the duty is. Why the government, why the INS officials have a mandatory duty or an obligation to immediately place a hold on somebody? Don't they have some discretion to determine whether or not somebody fits within the categories before they place a hold on someone? Well, if there were some question as to whether someone fit within the categories, I would agree with Your Honor. In this case, there is no question because they personally knew Vasquez and the agent had personally deported him on three prior occasions. So the question, though, as I understand, where does the hold come from? It's not explicitly stated in the statute. But what the statute does mandate, according to all the courts that interpret it, is that, in fact, the alien be taken into custody. And in order to do that, there has to be some process. And this is the process that has developed by which the INS has some discretion in determining how they're going to carry out their statutory duty. Well, I would guess they did have some discretion, and that's how they arrived at this method of finding out who was in the jail. And this is the method that, according to the agent's testimony, that were actually in the field doing this, was their standard. When was Vasquez? Do we know from the record when Vasquez's bail was set? I don't recall, Your Honor. I don't. Was there an automatic bail schedule? You know, some courts have, like, automatic bail schedules for a particular offense, and you just post the bail. Or did the magistrate judge in the state court set bail for him? I believe that the court set bail because there was an order signed by Judge Ewell, as I recall. Setting the bail. Correct. And do you recall what that bail was? I do not recall. Vasquez, theoretically, could have made bail right the next day. Well, if the hearing had occurred, I'm not sure when the bail hearing occurred, Your Honor. That's something that's not been argued or briefed, to my knowledge, in this case, as to when the bail hearing occurred. Now, let me ask you this. Is there anything that requires, in the statute of regulations, that requires INS officials to sort of, you know, to go to the jails, the local county jails, and to conduct the kind of program that they were conducting here? Well, again, Your Honor, it's not explicitly stated. They monitored the jails here for criminal aliens. Again, Your Honor, it's not explicitly stated in the statute, to my knowledge, or in the regulations. This was a somewhat recently enacted law where it made it mandatory instead of discretionary. And this is what, in fact, the agents did. And in order to fulfill the duty that Congress placed upon them, they've got to act reasonably in order to find out where these criminal aliens are so that they can, in fact, take them. Do you know what it means when they say, place a hold? What is that? It's a place a hold. Do these INS just call up and say, place a hold, don't release this guy because he might be a ‑‑ he might be a ‑‑ I believe it's a form that they ‑‑ Or do they have a warrant, or do they have some determination that he's subject to deportation? I think it's a form of paper that they fax, as I understand it. Or I guess they could deliver if they go over there. Look, one piece of paper. What does it say? They fill out, please hold this defendant because he's a criminal alien subject to immediate deportation upon release. And as the testimony ‑‑ Does that form in the record anyplace? I can't figure out what it was, but a hold was. I don't think it was in the ‑‑ it is in the record on this appeal. Well, Mr. Eiler, in any way, your case is that the INS had a mandatory duty, right? That's correct. To place a hold or to place a detainer against this person's release, and assuming that there was such a duty, the next question is, why isn't that overcome by the public duty exception, right? Yes, Your Honor, and I guess my answer is basically, as applied by the Washington Courts, there is no principle distinction between this case and the other cases that the Washington Courts have allowed to go forward, despite the public duty doctrine. And we believe that both the legislative intent exception and the failure to enforce exception apply in this case. And really, the most important, I think, argument that needs to be made is, what is required as far as legislative intent to protect a particular class? The United States argument is, gosh, it has to be a small and narrowly prescribed class. However, the Washington Court of Appeals in the Yonker case that I cited in the brief at page 30, and quoted, states, and I quote, the requirement is not that the class be small or narrow, but that it be particular and circumscribed. The Washington Courts have found such particular and circumscribed classes for victims of drunk drivers, victims of child abuse, victims of child neglect, victims of domestic violence. Those are the Bailey case, the Yonkers case, the Donaldson case. So what is your class here? I think there are two potential classes here. Well, clearly there's a victim of criminal aliens class. If the drunk driving statutes and the public intoxication statute that I cite in the brief are sufficient to establish a class for victims of drunk drivers, certainly the mandatory detention statute is sufficient to establish a class for victims of criminal aliens. Secondly, there's also legislative intent that talks in detail about burdens on law enforcement. These criminal aliens, Congress was told, routinely stay in the country or come back to the country and commit additional crimes. And the report to Congress talks about burdens on law enforcement. I would submit that this is the most extreme of burdens on law enforcement when an officer, a law enforcement officer such as Trooper Saunders, is gunned down in cold blood. So we think that the exceptions are satisfied for the public duty doctrine under the legislative intent exception and under the failure to enforce exception. The other issue that the United States raises is the actual knowledge argument. The United States denies it had actual knowledge that Vasquez was in jail. And I would submit, Your Honor, that there's simply no way we can allow the INS to simply close its eyes when it receives the facts. That constitutes actual knowledge. And the cases and authorities cited … The facts doesn't say that he's an illegal … that he's here illegally. No. It says who he is. It says who he is. And also we know from the testimony of the INS agents that they knew who he was and they knew he was illegal. They knew the name Vasquez on that list was the same Vasquez that they had previously deported when they got the shooting. That was the case? Well, they knew it was Solario Vasquez. The testimony was – and actually, this was in the talking points that INS developed. The testimony was that they personally knew Vasquez. So it's just kind of astonishing and tragic. Let me ask you this. At what point – it's a little bit unclear to me. But after they got the facts on the 27th – I forget the officer's name who had dealt with Vasquez in the past. Folkman, I believe. When was he over at the jail again? I don't remember the exact dates, Your Honor. It was, I think, six times within that two-week period. Within that two-week period before – or at least the week period, because Holguin went on vacation. Went on a different assignment. He went on a different assignment. He was there three or four days after the facts before he went on the vacation. Is there anything in the record that shows that he saw Vasquez there at the jail? Nothing that we were able to develop. Or that he met with Vasquez at the jail to interview him? Not that we're aware of. You know, I'd like to go back, if I might, for a moment about the public duty and your statement about DUI, drunken drivers. And you say that that is really just the same as here. It doesn't seem to me it is. The drunk drivers are – if they kill somebody or hurt somebody, again, being drunk, that's one thing. But it certainly didn't mean that if a drunk driver was guilty of theft or robbery or any of the other offenses. Whereas in this case, we have an alien who is released, apparently can be, under your theory then, could be guilty of anything. Any kind of theft, any kind of drunk driving or whatever. It seems to me it expands it to the whole safety of the public. Your theory. Well, Your Honor, I guess I would state that the whole public uses the highways, too. And certainly, and this kind of fits into the proximate cause argument. No, no, let's not get to proximate cause. I want to follow your – sure, it is the highways, that's true. But under your theory, would the drunken driver be guilty for theft or robbery or embezzlement and so forth? No. Well, not – But under your theory, the illegal alien would be. Yes, and in this instance particularly, because he is an aggravated felon, drug dealer, criminal alien. I mean, this is the type of conduct – Well, that's true then. So is it confined to if this person is not taken into custody and is guilty of another drug offense, that would be like the drug drunk driver, that it would be not a public, general public offense. Well, I guess the point I'm trying to make is that anybody can be a victim of a drunk driver, because there's so few people that don't use the highways. In fact, in the Bailey v. Forks case, it was the passenger that sued. It wasn't even the other driver. And, you know, whether the drunk driver ran into him or drove off the highway and hit a building, I would say that, yes, under the Bailey v. Forks analysis, it could go far beyond just getting in an accident on the highway because you're drunk. And in this instance, of course, Congress has discussed in great detail, as discussed by the United States Supreme Court in the most recent case, how many crimes these aliens commit. That's why they're categorized as a criminal alien and an aggravated felon. And that's why they're deportable. And that's why Congress said, thou shalt, you shall take these people into custody. All right, I agree with that. But then the question is whether it is a public duty, a general public duty to the entire public, or it is to a particular class. Well, I would say it's to the class of people who are likely to encounter criminal aliens in the course of criminal activity. And that's where I think the court could say it's the law enforcement community that Congress was trying not to minimize the burden on, where Trooper Saunders is a member of that class, in addition to being just a member of those who are victimized by criminal aliens. And to me, at least, I don't see the distinction between the victims of a drunk driver or the victims of child abuse or neglect or the victims of domestic violence and the victims of a criminal alien. But in this case, the fact that he is a state trooper, a law enforcement official, in the performance of his duties, he is the most likely person to run into a criminal alien because the alien is a criminal. So we think that there's two classes that can be applied under either the legislative intent exception or the failure to enforce exception to satisfy and avoid the public duty doctrine. I just have a minute left. I would like to touch briefly on proximate cause. I know that you've read the brief, and I would just point out that proximate cause is extremely liberal under Washington law. And we think that the court did not correctly apply Washington law. It just has to be the general field of danger, the general field of danger of letting criminals loose on societies that they commit more crimes. And it's that broad proximate cause standard that allowed in the McLeod versus school, most like school district case, to decide that leaving a storage room unlocked could be a proximate cause of a rape. But in other cases, failure to supervise parolees can be a proximate cause of a kidnap and a rape by the criminal. So we believe that the proximate cause determination should be reversed. I'd like to save my last 20 seconds, I guess, for a rebuttal. Okay. If you talk fast, we'll hear from the government, right? Good morning, gentlemen. My name is Robert Ellis. I'm an assistant with the U.S. Attorney's Office in Yakima. Let me start with duty and especially start there because of the Supreme Court case that came out after Judge Whaley issued his opinion. And there's several points here I want to make. First of all, the Supreme Court recognizes that 1226C has to be discretionary or they never would have addressed whether they had jurisdiction to hear Mr. Kim's appeal, or his habeas corpus petition appeal. Six justices of the Supreme Court joined in part one of that argument. It's an extremely short argument, but it's not necessary. It's not necessary to that opinion at all unless the Court felt that subsection E was a grant of discretion to the Attorney General. Let me change the facts slightly and give you a slightly different analogy, if I can. I know the panelist has argued the Osama bin Laden analogy, but I think this case presents a closer factual analogy on point. Let's assume for a minute, as Mr. Vasquez was at one point in time, arrested for first degree assault. We all accept that. He was in jail. Unfortunately, the victim in that case was an alien who was deported, so that charge was dropped. Assume just one change, and that is the victim was either a citizen of this country or a resident alien, and so he was available for prosecution. Let's assume that Judge Dennis Ewell had that case, as he had the Vasquez case in this one, and he granted Mr. Vasquez bail, which Mr. Vasquez made. Following the plaintiff's argument, then the service must, in fact, detain Mr. Vasquez, hold him and deport him or hold him for trial in state court, if you follow the plaintiff's argument. But let's assume for a moment the Border Patrol says, no, we're out of funds. It happened in late August, as this case did, at the end of the fiscal year, when money becomes very important to government entities. We're out of detention funds, and that's a common problem with INS, now BICE, if you will, and that's set forth in the legislative record with both parties' start. That was a principal issue addressed in that legislative record. So the Attorney General says, we're only going to keep the worst of the worst, and Mr. Vasquez may be charged with a violent offense, but he's only been convicted previously of two simple possession charges. He's not the worst of the worst. You mean there is a funding exception to the duty where you shall take him to custody? No, I'm not saying there's a funding exception. I think that the Attorney General, Your Honor, has discretion whether to enforce 1226C or not, and let me continue if I may. Let's assume somebody in Pasco didn't like the Border Patrol's decision, whether it be law enforcement such as Trooper Saunders, the Pasco Police Department, the Franklin County Prosecutor's Office. They file an action saying, no, Border Patrol, your statute, 1226C, requires you to come and detain Mr. Vasquez. I refer the court to 1226C, which says no court may second-guess the Attorney General on his decision whether to detain an alien or not. That's the plain language of the second sentence of subsection 1226E. But that has nothing to do with whether he has the duty. It just means it's not reviewable. Your Honor, it's not reviewable. In fact, it assumes he has the duty. Your Honor, if it's not reviewable, he must have discretion because nobody can tell him otherwise. That's the practical way of life. If someone does not have authority over you to tell you you have failed in your duty, then you have discretion. Another thing I'd like to point out. No, no, I don't think that's what discretion means. I mean, the way you use terms, you're saying you have discretion to violate the law. Can't be true. And I don't think that helps you at all. Just that it's not reviewable. That's my argument, Your Honor. The other... When did the duty kick in? That was what concerned me. Your Honor, I think you raised a good point in your question to counsel. And let me give you the court of background. There is a document, a hold document, which is faxed from Border Patrol or INS to the Phillip County Jail. It is a request they hold. It's not mandatory. There's no statute making those documents mandatory. It is a request. Most jails honor them, as did Franklin County Jail. But it's clearly law enforcement action to detain someone. And something that has been totally overlooked in this record, in my opinion, is Border Patrol, that Agent Don Holguin is the agent who knew Vasquez. He's one of four agents in Richland. Plaintiff assumes Agent Holguin saw that fax. There's no evidence that he saw that fax. The fax was sent to the office. INS and Border Patrol had no record of it when this case first started. Plaintiffs have supplied sufficient evidence. We have absolutely no reason to doubt the jail personnel. They, in fact, faxed that booking sheet. But at most, that booking sheet gives the name of Nicholas Vasquez, if I remember right, his date of birth and country of origin. Mr. Vasquez, the Mr. Vasquez we're talking about here, had three different A files under three different names. If you go to the congressional record, which talks about the basis for this change, they note that a problem throughout the INS system is the frequent use of aliases by illegal aliens. What point are you addressing now? His Honor's question about at what point the duty kicks in. It seems to me that the duty kicks in only when the INS has some basis to believe the name on that sheet of paper is the same name of the person who they've had identity or had dealings with. At that point, then, do you agree with counsel that they would have a duty, mandatory? Well, I accept your argument that you don't believe there's a mandatory duty. But at that point, would they have a duty? At that point, I think the statute kicks in. Yes, sir. Absent public duty documents and all those other things. Even though they haven't technically released him yet. Pardon me? They haven't technically released him. That's right. They would have a duty to, if they knew, place a hold. If they knew. If they knew there was a duty. If they had been to the jail and seen the live, warm body of Nicholas Vasquez and said, yes, that's the Nicholas Vasquez that I know to be the illegal alien or criminal alien. Yes. And I think the statute's been satisfied. I'd like to turn the tables just a little bit and give you another analogy, if I can. Let's assume that Mr. Nicholas Vasquez in Franklin County Jail, that's the same name or a name used by this Nicholas Vasquez, was in fact born in Mexico, but is now either a citizen or a registered alien. The act of the hold is to detain somebody. Now, mostly I'm a criminal prosecutor. I know of no basis to hold anybody except upon probable cause. And I would never, ever accept an agent coming to me telling me he has probable cause simply based upon a name. That's not sufficient. You have to make the identification. That's the next step required. And Washington law is perfectly clear that investigation or negligent investigation is not a cause of action. They've made that perfectly clear in a number of cases. I get the plaintiff's response to that is within the databases of INS, if you had just punched in the name Vasquez, he would have known that he had been previously deported and that he had been convicted of a prior aggravated felony. I'll grant that possible. I don't know that this Court should make law enforcement responsible for all the vast information contained in the computer systems they have access to. That sounds like constructive knowledge to me. And I just don't think that's the point. That's essentially an argument. Pardon me? Yes. But that doesn't address my argument, sir, that the identity is not complete until you see a live, warm body. Let's assume that Agent Hogan sees the facts, goes to the computer and confirms, yes, that sounds like my guy. Does he have probable cause to hold somebody in jail? So you would say that they need at least, there must be some objective facts showing probable cause to place a hold. I know of no other basis under our laws to hold anybody in jail. Yes, sir. So they have some discretion in figuring out, in determining, you know, how they're going to go about determining whether somebody falls within one of these categories. They have to, sir. To do otherwise, the plaintiff's argument is they must break the law. They must detain somebody without sufficient probable cause. And I know of no basis for that. Well, you know, your argument almost seems to contain within it the idea that we don't have enough facts here or the district court didn't have enough facts to grant summary judgment to the government because they didn't know anything about these things. They didn't know anything. There's not enough facts in the record to decide these questions that you're raising. Well, I think there was, Your Honor. I, we did extensive depositions. So we focused solely in the district court on the liabilities. You didn't do any damages discovery at all. And I don't think there are any more facts to uncover. They deposed all the agents. They had all the INS and border patrol records. They had all the jail records. Well, do we know what was in the INS computer? Oh, I'll stipulate to the court that Nicholas Vasquez Solario was in the INS computer. And what did it say about him? I want to be careful because there were three files. And I know that one of those files was found well after the fact. The computer would have tied in the one file that had one simple possession conviction. It would have tied in an A file that did not have a conviction. And the second, or excuse me, the third A file, which, under which the second simple possession conviction was received, was not tied in at that time in the system. Now, I'll read that. I don't know whether it's in the record. So my question is, what did it say about him? It mean the computer. Pardon me? What did the computer say about Vasquez, that he was a, you know, a criminal alien? Well, it doesn't categorize people like that, Your Honor. Well, didn't it say that he had a prior conviction or not? The computer record indicated he had a prior conviction, one prior conviction for possession. If that's a computer and it's accessible to the INS agents, assuming 1226 imposed the duty at some point to detain a criminal alien, then if that's a mandatory duty, then if you look at that computer and it says he's a criminal alien, why shouldn't the U.S. be required to detain him at that point? Because the computer and the knowledge of the agent sitting at the computer terminal has no knowledge of who the live, warm body is sitting over at Franklin County Jail. You're saying that computer information is not sufficient to give rise to reasonable cause? I'm saying I would never, as a prosecutor, authorize an agent to arrest someone based solely upon name as identification. And I think there's lots of criminal cases supporting that position. Did you give rise to the duty to take his fingerprints then? Pardon me, sir? Did they have his fingerprints? No, there's no fingerprints at that time. They were not given the fingerprints by that fax from the Franklin County Jail. Well, they could have gotten it from the local law enforcement, didn't they? Sure they have. They could have gone to the jail and looked at him, but my point, Your Honor, is that's investigation. And Donaldson, the Washington State court's case, Donaldson says, you don't have to take that and accept investigation. That's not a tort in this state. If I could address public duty doctrine briefly. It's clearly our position that legislative intent does not apply to the case law in the face of the statute. That's simply not the case here. The argument as to failure to enforce, again, I'll go back to the knowledge element, which I argued in front of Judge Whaley. There is no actual knowledge on the part of any of those agents as to who Mr. Vasquez, sitting in Franklin County Jail, was. They had to have that knowledge before they had actual knowledge that he was the person sitting in the jail was a criminal alien. And finally, it appears to the government that the plaintiff's argument envelops the public duty doctrine completely. The plaintiff suggests that you categorize or come up with a class by describing a characteristic of the criminal. And I don't think any of the Washington case law does that. Certainly, Bailey doesn't. Bailey characterizes or describes a class by the person to be protected by the statute, not by the character of the criminal. And if the only logical step, I think, as was pointed out in questioning, is that if you accept that as the class, it subsumes the entire exception. The plaintiff made a point that the purpose of the amendment was burdensome, was to correct the burdensome nature of these cases on law enforcement. There's nothing in the legislative history which suggests that dangerous to law enforcement is the burden it's addressing. It's addressing the cost, the man hours, the resources applied to these cases, not the danger presented by the aliens. What are you referring to when you talk about the resources necessary to do all this? Your Honor, the legislative record, it's cited by both parties. You're talking about legislative history? Yes. All right. It's... That's fine. Okay. It's cited in both briefs, Your Honor. And I want to discuss proximate cause real briefly. Nobody likes seeing a cop shot on duty. I'm a prosecutor. I hate it. I absolutely hate it. But the question becomes one of public policy. Everyone recognizes that the INS and Border Patrol has limited resources, and they're throwing those limited resources at an overwhelming problem. In this particular case, there was an intervening factor. There was a superior court judge, Dennis Yule. Dennis Yule set bond on Mr. Vasquez for $5,000 before he was released. Under Washington state law, I wasn't at that hearing. I can't tell you what was presented, Judge Yule. But under Washington state law, he is to review the criminal history of the defendant, the reputation of the defendant, the likelihood that the defendant will run, the likelihood the defendant will commit other violent crimes. Judge Yule set a relatively low bond of $5,000. He did not foresee this problem. I don't know if you know Judge Yule, but he's an amateur. He's a very careful man. Very careful man. He didn't foresee the problem, and it just isn't fair somehow to impose the burden upon a senior Border Patrol agent, Don Holguin, that Agent Holguin should have seen something the judge did not. Thank you. Let me ask you just one last question. You know, there's a subsection D, 1226 subsection D, which requires the attorney general to devise and implement a system to make available daily to federal, state, and local authorities the investigative resources of the service to determine whether individuals arrested by such authorities for aggravated felons are aliens. Was there a formal agreement between the local INS office here and the jail here? Oh, absolutely not. Not at that time. In fact, frankly, at that time, Franklin County on its own faxed the booking sheet, and of the nine counties serviced by this office, four agents, they were the only one that faxed the daily booking sheet. There was no agreement in place at all at that time. Are you aware of any policy statements or regulations adopted by the attorney general to carry out the subsection D? That existed at that time? This was summer of 1999. Yeah, Your Honor, I can't be sure. I know there are in place such things now. Today. But I can't be sure. You hear about it all the time in the press today about how. Sure. I'm just not sure that they were in place. By the local officials to work with them. Yes. OK, Mr. Ellis, thank you. Thank you. All right, may I ask the court to indulge and I'll read two portions of the brief. Page nine of plaintiff's or appellant's reply brief. The U.S. Supreme Court states, was following those reports of criminal alien activities, that Congress enacted 8 U.S.C. section 1226, requiring the attorney general to detain a subset of deportable criminal aliens, pending the determination of their removability. So the U.S. Supreme Court has already interpreted this statute to say, you issue the hold and then you figure out whether it's the correct alien. Lastly, and in closing, I would. Well, they have to know that the alien is a criminal record qualified. Correct. Which they did in this case. Well, they do. They know there was an allegation. They didn't. They weren't even sure who he was, according to Mr. Ellis. Well, that simply contradicts the testimony of the agents. It contradicts what the I.N.S. put in their own talking points after their original investigation. And that's the last thing I would like to read is what the talking point said. All of this we have discretion argument came up late in this litigation. Right after the event, what they said to the public in their talking points was, and I quote, as he, meaning Vasquez, was a criminal alien and subject to mandatory I.N.S. detention requirements, the I.N.S. would have no choice but to remove him. That's not my argument. That's what I.N.S. said to the public at the time. We would ask that the court reverse the summary judgment. Okay. Thank you. We thank both counsel for your argument. This case is now submitted for decision. And the panel will now stand in recess for the day.  The court for the second stand adjourned. Judge Huck, hello. Yeah. I'll go in the conference room and we'll call you in just a moment. At the same spot? Where would you like to be phoned? Do you want to go back? This would be fine. Okay. Where are you at? I'm not quite sure. I'm not sure either. Well, I'm at the table where the visual is. Okay. I think Dennis knows it. But you're not at your 5949 number, right? It's not your office number. But I could move to there. Where would you be most comfortable? Do you want to take it? Well, that'll be fine. Do you want to take five minutes and then I'll have him? Yeah. Okay. We'll do that. Thank you, Judge. All right. I'll see you tomorrow then, too. All right. Okay. Okay. Where do I go? Probably back to your office because there's no phone back here. Yeah, I wasn't sure. Okay. I'll bring your stuff. Do they know to call you on your phone? Probably not. 5949, they said. Um, do you want me to just go ahead and do that? Or do you want me to call them? Uh, I guess it's better if they get to where it is. How's that work? Good.
judges: Hug, Tashima, Paez